# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ERNEST MATTISON,

                        Plaintiff,

                v.

V. JOHNSON, et al.,

                        Defendants.

9:17-CV-1198
(TJM/ATB)

ERNEST MATTISON, Plaintiff, pro se
BRIAN W. MATULA, Asst. Attorney General for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, United States District Judge. Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 93). Plaintiff responded in opposition to the motion, and defendants filed a reply. (Dkt. Nos. 99, 101). Plaintiff also filed a letter motion to supplement the record with additional medical evidence, which evidence this court has considered in its review. (Dkt. No. 100). For the reasons set forth below, this court will recommend granting defendants' motion and dismissing the third amended complaint.

## DISCUSSION

### I.    Facts

Detailed summaries of plaintiff's allegations are set forth in the various decisions issued by Judge McAvoy since the inception of this case. (Dkt. Nos. 13 at 4-6; 21 at 2-

6; 79 at 5-6). This court assumes familiarity with those summaries and will discuss below the specific facts and exhibits necessary to address defendants' motion for summary judgment.

## II.     Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities,

and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III. Deliberate Indifference to Medical Needs

### A. Legal Standard

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

#### 1. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Benjamin v. Pillai,* — Fed. App'x —, No. 18-545-pr, 2019 WL 5783304, at *2 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Salahuddin*, 467 F.3d at 279. The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 844–47 (1994)).

3

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185–86). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

## 2.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to

4

subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Abreu v. Lipka,* 778 Fed. App'x 28, 32 (2d Cir. 2019) (quoting *Smith,* 316 F.3d at 184). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer,* 730 Fed. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention

he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

**B.    Analysis**

Plaintiff's surviving causes of action allege the inadequacy of the medical care plaintiff received, together with the alleged delay in care, relative to his (1) dental treatment, (2) pain management, (3) podiatric treatment, and (4) urological treatment.

**1.    Dental Treatment**

Plaintiff alleges that while incarcerated at Clinton Correctional Facility ("Clinton"),[1] Dr. Marra and Dr. Dawson violated his Eighth Amendment rights by delaying the removal of a broken tooth. (Dkt. No. 80 at 4, 6). According to plaintiff, in 2013 he suffered an epileptic seizure during a court appearance, causing him to fall and break the tooth to the immediate right of his top front teeth.[2] (Dkt. Nos. 93-10 at 18-19;

---

[1]Plaintiff was incarcerated at Clinton from approximately May 2015 until his transfer to Sullivan Correctional Facility in May 2018. (Dkt. Nos. 99 at ¶ 1; 93-12 at ¶ 64).

[2]Plaintiff described and identified the subject tooth at his August 2, 2019 deposition. (Dkt. No. 93-10 at 4, 6). Based on plaintiff's description, defendant Dr. Marra has identified the

99-1 at 8-9). Plaintiff testified that the dentist at Riker's Island, plaintiff's temporary holding facility at the time, documented his injury and indicated that Tooth #7 had broken "basically to the gum line," requiring removal. (*Id.* at 19). However, plaintiff's tooth remained untreated for the two years leading up to his transfer to Clinton.[3] (*Id.* at 23-24, 31).

Plaintiff was transferred to Clinton in 2015, and requested to see a dentist within his first week. (*Id.* at 38, 40). Plaintiff claims that the first dentist who examined him agreed that Tooth #7 required extraction, and placed him on a waiting list for the procedure. (*Id.* at 43). Allegedly, this dentist retired shortly thereafter, before extracting plaintiff's tooth. Plaintiff subsequently filed a grievance regarding his dental treatment, and in response was seen by defendant Edward Marra, D.D.S. Dr. Marra explained that Clinton did not have a full time dentist, and that plaintiff was still on the waiting list for an extraction. (*Id.*). According to plaintiff, Dr. Marra subsequently treated him several times between 2015 and 2018, including to extract a different tooth; however for some reason, he delayed the extraction of Tooth #7. (*Id.* at 44-45). Plaintiff was also treated by at least three other dentists at Clinton, but claims they too

subject tooth at Tooth #7 (Dkt. No. 93-12 at ¶ 24 n. 1), which plaintiff does not dispute in his motion papers.

[3] Plaintiff testified that between 2013 and 2015 he was provided care for other dental issues with "no problem," however no dentist addressed his discomfort and pain at Tooth #7. (Dkt. No. 93-10 at 25, 30). Plaintiff was transferred among several facilities between 2013 and 2015, and claims to have complained about Tooth #7 at each facility. (*Id.* at 31-32). Allegedly, plaintiff was on a waiting list to extract Tooth #7, however this is not evidenced in plaintiff's dental records provided by DOCCS, nor do these pre-Clinton records indicate that plaintiff complained of any pain with respect to Tooth #7 at that time. (Dkt. No. 95-1 at 12).

failed to treat Tooth #7.  (*Id.* at 50-51).  Tooth #7 was surgically removed in 2018 at Sullivan Correctional Facility ("Sullivan C.F."). (*Id.* at 53-57, 63).

### a.    Dr. Marra

At all relevant times, Dr. Marra was the Regional Dental Director of DOCCS, where his job duties included administrative responsibilities as well as providing clinical dental care to inmates at Great Meadow Correctional Facility.  (Dkt. No. 93-12 at ¶¶ 4-6).  In early 2015, Clinton experienced a decrease in dental staff.  (*Id.* at ¶7-8).  As a result of the shortage, and in addition to hiring additional dental staff, Dr. Marra traveled to Clinton one day per week to provide coverage.  (*Id.* at ¶¶ 12-14).

According to Dr. Marra, plaintiff never reported pain or other concerns regarding Tooth #7 to him, or any other dental professional at Clinton.  (*Id.* at ¶¶ 28-29).  Dr. Marra first encountered plaintiff for an initial examination on October 28, 2015. Plaintiff did not state he was experiencing any pain.  (*Id.* at ¶¶ 41, 43).  Upon examination, it was apparent to Dr. Marra that plaintiff needed dental treatment, however no emergent conditions presented at the time.  (*Id.*).  Dr. Marra directed that plaintiff's next appointment be scheduled for routine care.  (*Id.*).  Two months later, plaintiff filed a grievance concerning fillings that had fallen out and chipped teeth.  (*Id.* at ¶ 44).  In response, Dr. Marra examined plaintiff on January 6, 2016 and resolved plaintiff's complaint regarding a chipped lower tooth.  (*Id.* at 45).  Dr. Marra's next encounter with plaintiff was on February 22, 2017, at which time he extracted Tooth #20.  He also provided plaintiff with post-extraction pain medication.  (*Id.* at ¶54).  At

the same appointment, Dr. Marra scheduled Tooth #7 to be extracted at plaintiff's next visit. (*Id.*) The record is devoid of any complaints of pain by plaintiff regarding Tooth #7 at that time.[4]

Plaintiff was seen in the dental clinic for emergency sick call on March 1, 2017; March 14, 2017; and March 30, 2017; regarding post-extraction pain at Tooth #20. (*Id.* at ¶ 55, Dkt. No. 95-1 at 8). Plaintiff was prescribed an antibiotic and pain medication to address his complaints of pain, despite the fact the extraction site was noted to be healing well. (Dkt. No. 93-12 at ¶ 56). The dental staff determined not to extract Tooth #7 at that time. In April 2017, plaintiff again requested emergency dental care at the clinic, complaining of right temperomandibular joint ("TMJ") pain. (Dkt. No. 93-12 at ¶ 58). At his emergency visit, plaintiff was scheduled to be seen by an oral surgeon on May 17, 2017 to address his complaints of TMJ pain, as well as for the extraction of the root tip of Tooth #7.[5] When plaintiff arrived for his May 17, 2017 appointment, he was "uncooperative" and "making a big noise in the dental clinic." (Dkt. No. 95-1 at 8). Plaintiff was removed from the dental clinic due to the disturbance. (*Id.*). Plaintiff was seen again on June 8, 2017, where he was noted to be "uncooperative." (*Id.* at 7).

---

[4]The foregoing constitutes the sum of plaintiff's dental treatment by Dr. Marra, however as discussed in the following paragraph, plaintiff was also treated by other dentists at Clinton. (Dkt. No. 95-1).

[5]According to Dr. Marra, plaintiff had a root canal performed on Tooth #7 sometime prior to his incarceration. During the course of plaintiff's root canal, the nerve of Tooth #7 would have been removed, precluding any future sensations of pain in the tooth from reaching his brain. (Dkt. No. 93-12 at ¶ 31-32). Therefore, Dr. Marra argues, Tooth #7 could not have been the source of the alleged pain presently referred to by plaintiff. Regardless, there is no evidence that plaintiff's TMJ pain was attributed to the condition of Tooth #7, especially considering that Tooth #7 is located in the front of the mouth. (*Id.* at ¶58).

Nevertheless, he received a full mouth cleaning, and was informed that the extraction would occur at his next visit. (*Id.*; Dkt. No. 93-12 at ¶ 60). Although plaintiff was scheduled to return to the dental clinic on November 6, 2017, the record indicates that plaintiff had just returned from the hospital for an emergency medical issue, and was experiencing "a lot" of testicular pain. (Dkt. Nos. 95-1 at 7; 93-12 at ¶ 61). The extraction was therefore postponed. (*Id.*). On December 27, 2017, plaintiff was seen at the dental clinic for an emergency call-out, complaining of swelling on the right side of his face. (Dkt. No. 95-1 at 7). Plaintiff was treated with antibiotics and pain medication, and referred to the medical department for further care. (Dkt. No. 93-12 at ¶ 62). The writer further noted that plaintiff was still on the wait list for a consultation about his TMJ pain and to extract Tooth #7. (Dkt. No. 93-12 at ¶ 63). Plaintiff was transferred out of Clinton in May 2018, and his dental records indicate that the root tip of Tooth #7 was surgically removed in October 2018. (Dkt. Nos. 93-12 at ¶¶ 64, 67; 95-1 at 4).

Plaintiff claims that Dr. Marra was deliberately indifferent to his serious medical needs by "knowing that plaintiff needed a broken tooth removed since 2015," yet failing to extract the same. (Dkt. No. 80 at 6). Plaintiff further avers that Dr. Marra is liable to the extent of his "gross negligence in supervising subordinates," in conjunction with the failure to extract Tooth #7. (*Id.*).

With respect to the objective requirements of deliberate indifference, no rational factfinder could conclude that Dr. Marra failed to provide plaintiff with treatment. Accordingly, the court's inquiry is narrowed to the question of whether plaintiff

received adequate care, and whether any inadequacy in medical care was sufficiently serious. *Valdiviezo v. Boyer,* 752 Fed. App'x 29, 31 (2d Cir. 2018) (citing *Salahuddin*, 467 F.3d at 280). When the basis for a prisoner's claim "is a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court examines whether the delay itself created a risk of harm. *Smith*, 316 F.3d at 185-86 (2d Cir. 2003). In considering whether a delay caused a risk of harm, a court may consider "[t]he absence of adverse medical effects or demonstrable physical injury." *Id.* at 187. To this end, there is no evidence that plaintiff complained of pain or made any requests regarding Tooth #7 upon arrival to Clinton, or during his initial dental examination with Dr. Marra. Plaintiff was thereafter seen in the dental clinic on two separate occasions for treatment, including the extraction of a different tooth, however there is no evidence that during this time plaintiff was experiencing pain or complications with Tooth #7. In February 2017, Tooth #7 was identified for extraction by Dr. Marra, at which time the procedure was scheduled for plaintiff's next visit. (*Id.* at 9). The extraction was postponed several times between February 2017 and October 2018. However, the record reflects that the delay was due to a number of intervening factors, including plaintiff's other medical conditions, a hospitalization, and plaintiff's uncooperative behavior in the dental clinic.

Plaintiff, claiming that Dr. Marra "never made/took adequate notes or records, nor made adequate markings upon his [examinations]," appears to argue that his complaints regarding Tooth #7 were not adequately documented. (Dkt. No. 99 at 7). Nevertheless, a review of plaintiff's dental records reveals that dental staff, including

Dr. Marra, provided reasonable detail at each dental examination regarding the tooth at issue, the complaint presented by plaintiff, and the treatment provided and/or scheduled. Plaintiff fails to advance any reasonable explanation why the dental staff would have been attentive in providing the details of plaintiff's complaints and treatment regarding *other* teeth, but not Tooth #7.

In a further attempt to raise a material issue of fact, plaintiff has submitted several grievances he filed while at Clinton, regarding the quality of his dental care. On November 1, 2015, plaintiff complained about the lack of follow-up care after his initial visit with Dr. Marra. (Dkt. No. 99-1 at 4). Plaintiff filed another grievance on November 28, 2015 addressing the same issues, and lack of response to his dental sick call slips. (*Id.* at 10). On December 6, 2016, plaintiff submitted a third grievance indicating that he was in very bad need of "adequate dental care," that his teeth had holes and were broken, and claiming a delay in dental care for over a year. (*Id.* at 18). Finally, on July 17, 2017,[6] plaintiff filed a grievance indicating that his "right upper canine tooth" fell out, causing pain and bleeding, because of inadequate dental care at Clinton. (*Id.* at 25). Although plaintiff's grievances raise general complaints about the dental care provided at Clinton, none specifically identifies pain resulting from a delay in treating Tooth #7. Moreover, plaintiff's allegations of inadequate or delayed dental care are belied by the dental records indicating that during plaintiff's approximately three years at Clinton, dental staff repaired his cracked teeth, extracted several teeth

---

[6]As of this date, plaintiff had been treated on at least ten separate occasions in the Clinton dental clinic. (Dkt. No. 95-1 at 7-10).

other than Tooth #7, prescribed pain medication in response to complaints of post-extraction pain, and provided routine cleaning.

Even if the aforementioned presented an issue of material fact as to whether the 17-month delay in extracting Tooth #7 satisfies the objective requirement of deliberate indifference, no rational factfinder could conclude that Dr. Marra acted with the requisite culpability necessary to impose liability. The record lacks any evidence that Dr. Marra intended to deny or unreasonably delay plaintiff's access to necessary dental care, or wantonly inflicted unnecessary pain. On the three occasions that he treated plaintiff (in his limited capacity at Clinton), Dr. Marra directly addressed plaintiff's documented complaints. (Dkt. No. 95-1 at 9-10). Furthermore, upon Dr. Marra's first determination Tooth #7 required extraction, he immediately scheduled the procedure for the next visit. There is no evidence that Dr. Marra had any control over, or even knew about, the subsequent delay in extracting Tooth #7, resulting from plaintiff's other medical needs and his uncooperative behavior. Furthermore, there is no indication that Dr. Marra knew plaintiff was, allegedly, in significant pain resulting from a failure to extract Tooth #7 any earlier.

Plaintiff further alleges that Dr. Marra failed to adequately supervise subordinates, resulting in the alleged constitutional violation. (Dkt. No. 80 at 5). To establish liability on this basis, "[p]laintiff must show that [Dr. Marra] knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk,

and that failure caused a constitutional injury to Plaintiff." *Frederick v. Sheahan*, No. 10–CV–6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014) (alterations and quotations omitted) (quoting *Poe v. Leonard*, 282 F.3d 123, 142 (2d Cir.2002)). A general allegation that a defendant failed to supervise his[7] subordinates is insufficient to establish his personal involvement in any alleged constitutional violation by the subordinates, in light of the absence of any factual connection between his alleged failure to supervise and the harm that eventually befell plaintiff. *See Samuels v. Fischer,* 168 F. Supp. 3d 625, 638-39 (S.D.N.Y. 2016) (listing cases). Here, plaintiff advances no evidence, beyond the conclusory statements in his complaint, raising a material issue of fact that Dr. Marra knew or should have known of, but disregarded, a high degree of risk that his alleged subordinates would behave inappropriately.

For these reasons, this court recommends that plaintiff's deliberate medical indifference claim against Dr. Marra be dismissed.

### b.    Dr. Dawson

On December 12, 2016, plaintiff filed an administrative grievance regarding his dental treatment, which stated in relevant part:

> I am in very bad need for "adequate" dental care, my teeth

---

[7]It is unclear whether Dr. Marra exercised any supervisory authority over the other dentists at Clinton. As the Regional Dental Director for DOCCS, Dr. Marra had "administrative responsibilities pertaining to the dental clinics within the facilities within [his] region and [was] available to the administration of each of the facilities for policy or other questions pertaining to the dental services within their respective facilities." (Dkt. No. 93-12 at ¶ 5). It appears that Dr. Marra's primary duty, however, was to provide clinical care to inmates at Great Meadow Correctional Facility. (*Id.* at 6). Nevertheless, even assuming that Dr. Marra had supervisory authority over the other dentists at Clinton, it would not change the court's analysis as to liability in this regard.

14

> have holes in them [sic] are also cracked off [and] also broken. I was told over a year ago, that I would be seen [and] given the fillings [and] have the teeth removed [sic] which has been over a year thus far [and] my teeth are becoming worse. . .

(Dkt. No. 93-5 at 4). Plaintiff's grievance was processed through the Inmate Grievance Resolution Committee ("IGRC"), which determined that plaintiff was scheduled for an extraction pending any unforeseen circumstances. (*Id.* at 38). Plaintiff appealed the grievance to the Superintendent, who determined that plaintiff had refused dental treatment two months prior, and would be rescheduled to see the dentist within a month. (*Id.* at 5). Plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC"), which determined in a November 8, 2017 decision that plaintiff had been seen by the dentist on August 11, 2016, and four other times between February 22, 2017 and June 8, 2017. (*Id.* at 1). CORC further indicated that plaintiff was scheduled to see the oral surgeon in the near future. (*Id.*).

Relevant to plaintiff's claim against Dr. Dawson, the decision from CORC indicates that it was made, among other things, "upon recommendation of the Dental Director." (*Id.*). The "Dental Director" referred to by CORC has since been identified as defendant William Dawson, D.D.S. (Dkt. No. 36). Plaintiff attempts to impute liability to Dr. Dawson for deliberate indifference in delaying the extraction of Tooth #7, based on Dr. Dawson's participation in CORC's grievance review. Specifically, plaintiff contends that Dr. Dawson knew of plaintiff's "ongoing pain and years of discomfort," because Dr. Dawson "answered my [grievance] stating that 'I am scheduled to be seen by the oral surgeon in the near future.'" (Dkt. No 80 at 6).

The parties do not dispute that Dr. Dawson, the Assistant Director of Correctional Dental Services for DOCCS ("Assistant Director"), never treated plaintiff, met with plaintiff, or otherwise corresponded with him. As the Assistant Director, one of Dr. Dawson's responsibilities was to review inmate grievance appeals and attempt to verify the factual accuracies of the underlying claim and Superintendent's decision appealed from. (Dkt. No. 93-3 at ¶¶ 5-6). Dr. Dawson would then convey his findings to CORC, which relied, in part, on his investigation to determine the outcome of a grievance referred to them. (*Id.* at ¶¶ 5-6, 13). Dr. Dawson was not a member of CORC, and had no authority or participation in determining the outcome of plaintiff's appeal. (Dkt. No. 93-3 at ¶ 9). His duties were limited to an investigation of the facts supporting the Superintendent's underlying decision, which investigation was then forwarded to CORC for their review and determination. (*Id.*). To this end, the extent of Dr. Dawson's involvement in plaintiff's grievance is memorialized in his September 28, 2017 email to CORC members, identifying plaintiff's previous dental treatment at Clinton. (Dkt. No. 93-5 at 6).

To hold a defendant liable under § 1983, the plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Green v. Venettozzi,* No. 9:14-CV-1215 (BKS/CFH), 2018 WL 7917917, at *13 (N.D.N.Y. Nov. 21, 2018), Report-Recommendation Adopted, 2019 WL 624922 (N.D.N.Y. Feb. 14, 2019)(citing *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)). Moreover, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983[,]" and supervisory officials may not

be held liable merely because they held a position of authority. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). A defendant may be considered "personally involved" if

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).[8]

Obviously, liability does not impute to Dr. Dawson based on any direct participation in the allegedly deficient care of Tooth #7. Assuming personal

---

[8]Many courts in this Circuit have discussed whether all of the personal involvement factors, set forth in *Colon*, are still viable after *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). See, e.g., *Conklin v. County of Suffolk*, 859 F.Supp.2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether Colon had been overruled or limited, and continued to apply the factors outlined in Colon. *Id*. In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the Colon prongs are insufficient to state a claim against a defendant-supervisor.'" *Id*. (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y.2011)). *See also Young v. Choinski*, 15 F. Supp. 3d 172, No. 3:10–CV–606, 2014 WL 962237, at *10–12 (D.Conn. Mar. 13, 2014) ("Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.").

involvement was established by Dr. Dawson's participation in investigating plaintiff's complaint, there is nothing in plaintiff's grievance, or his dental records, that would have alerted Dr. Dawson to plaintiff's alleged "ongoing pain and suffering" resulting from Tooth #7.[9] Nor did plaintiff's dental records reflect that plaintiff's dental issues were being disregarded or ignored by facility dental staff. (Dkt. No. 93-3 at ¶ 18). The records did, however, indicate that plaintiff was scheduled to see an oral surgeon in the near future, and had otherwise received various forms of dental treatment in the preceding year. Accordingly, summary judgment is recommended as to Dr. Dawson, considering plaintiff's failure to raise a question of fact which could support a claim of liability. *See Gathers v. Tan*, No. 10-CV-0475, 2014 WL 12648666, at *11 (W.D.N.Y. Aug. 21, 2014) ("While RHSA Blaise's investigation of plaintiff's complaint of inadequate medical care is sufficient to establish personal involvement of a supervisory official, there is no question but that at the time of her investigation, there was no evidence of deliberate indifference to plaintiff's medical needs for RHSA Blaise to remedy because plaintiff was scheduled for the MRI he was requesting."), *see also Green v. Venettozzi*, 2018 WL 7917917, at *14.

## 2. Pain Management

Plaintiff alleges that defendants Vonda Johnson, M.D. and Nurse Practitioner

---

[9]As of the date of Dr. Dawson's email to CORC, plaintiff was still on the wait list to have Tooth #7 extracted. Nevertheless, and as previously discussed, there were no complaints of pain regarding Tooth #7 in plaintiff's dental treatment records from which Dr. Dawson could have inferred that plaintiff was suffering. Furthermore, Dr. Dawson would have observed that Tooth #7 had yet to be extracted in light of plaintiff's other overriding medical issues, as well as his uncooperative behavior in the dental clinic.

Calley exhibited deliberate indifference to his medical needs by failing to properly treat his chronic pain. Specifically, plaintiff states that he was forced to endure "many months with burning and swelling hands and feet," as a result of his alleged neuropathic condition. (Dkt. No. 80 at 5-6). Defendants argue that plaintiff's pain was adequately treated, undermining his claim of deliberate indifference.

Prior to 2015, plaintiff was prescribed Percocet at other DOCCS facilities in response to his complaints of chronic pain. (Dkt. Nos. 93-8 at ¶13; 93-10 at 34). Upon plaintiff's transfer to Clinton, medical staff continued to administer the Percocet. (Dkt. No. 93-10 at 83). However, in July 2016 plaintiff was temporarily housed at Downstate Correctional Facility ("Downstate") for a court appearance, when he presented to the infirmary with significant constipation. (Dkt. No. 94-1 at 391). According to plaintiff's Ambulatory Health Records ("AHR"), plaintiff's Percocet was discontinued at that time in an effort to alleviate his constipation. (Dkt. Nos. 93-8 at ¶ 18; 94-1 at 391). Downstate medical staff alternatively prescribed plaintiff Mobic to address his complaints of pain.[10] (*Id.*). When plaintiff returned to Clinton in August 2016, his

---

[10]According to the sworn affidavit of Dr. Johnson, plaintiff "immediately began refusing" the Mobic prescribed by Downstate. (Dkt. No. 93-8 at ¶ 20). However, the basis for Dr. Johnson's statement is unclear. Plaintiff was seen by Downstate medical staff and prescribed Mobic on July 6, 2016. (Dkt. No. 94-1 at 391). The same day, plaintiff was noted to be "out to court." (*Id.*). The next progress note, written on July 8, 2016, indicates that plaintiff was refusing to take his prescribed medications that were available at the time, with Mobic being the only medication not yet available, due to the pharmacy's hours. (Dkt. No. 94-1 at 390). The AHR progress note, written at 11:25 a.m., further noted that "delivery of Mobic will be later today." (*Id.*). The record does not clarify whether plaintiff eventually took the Mobic, once it was delivered from the pharmacy, or with what frequency he took the Mobic throughout the

request to discontinue Mobic and resume taking Percocet was denied. (Dkt. Nos. 93-8 at ¶ 21; 94-1 at 379-80). Plaintiff also refused to take motrin or tylenol. (*Id.*).

Percocet, a commonly known opioid pain medication, is a controlled substance that can become extremely addictive. (*Id.* at ¶ 13). According to Dr. Johnson, plaintiff's subjective complaints of pain while housed at Clinton were often contradicted by objective medical examinations and observations. (*Id.* at ¶¶ 33-36). Dr. Johnson further avers that it became difficult to determine whether "the pain [plaintiff] complained of was true pain[,] or whether plaintiff was exaggerating the pain for the purpose of obtaining [Percocet]." (*Id.* at ¶ 32). In light of these concerns, plaintiff was alternatively prescribed a trial of Cymbalta in October 2016. (Dkt. Nos. 93-8 at ¶ 23; 94-1 at 370-71). Plaintiff continued the Cymbalta regimen through March 2017, during which time he requested "stronger meds" because Cymbalta "is a psychiatric drug [and] is not working." (Dkt. No. 94-1 at 314, 321, 323, 352). In response to his complaints, plaintiff was alternatively prescribed Elavil to address his alleged neuropathic pain. (Dkt. Nos. 93-8 at ¶ 27; 94-1 at 526). The Elavil was discontinued after approximately one month, due to plaintiff's consistent refusal to take the medication. (Dkt. Nos. 93-8 at ¶ 28; 94-1 at 280). Plaintiff was sent for an EMG test to help diagnose and treat his condition, which test revealed mild to moderate peripheral neuropathy, consistent with sporadic complaints of "pins and needs and burning sensation," but "did not . . .

---

remainder of his temporary housing at Downstate.

account for plaintiff's complaints of significant pain necessitating powerful prescription medication." (Dkt. Nos. 93-8 at ¶ 30; 94-1 at 150). In November 2017, after a discussion with plaintiff concerning his pain management, Dr. Johnson discontinued the Elavil and prescribed a stronger dosage of Cymbalta. (Dkt Nos. 93-8 at ¶ 27, 94-1 at 267). Moreover, the record reflects that motrin, tylenol and naproxen were available to address plaintiff's complaints of pain. (Dkt. Nos. 93-8 at ¶ 38).

Plaintiff now asserts that Dr. Johnson and NP Calley violated his Eighth Amendment rights in failing to provide him "adequate medications" for his chronic pain; particularly in failing to re-prescribe Percocet. (Dkt. No. 80 at 5). As to the first inquiry of the objective prong, however, no reasonable juror could find that plaintiff "was actually deprived of adequate medical care." *Salahuddin,* 467 F.3d at 276. "The word 'adequate' reflects the reality that '[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Acosta v. Thomas,* No. 9:16-CV-0890 (LEK/TWD), 2019 WL 5197313, at *14 (N.D.N.Y. June 21, 2019) (quoting *Jones v. Westchester Cty. Dep't of Corrs. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008)). Here, the evidence of record reflects that plaintiff was frequently seen in the medical clinic, prescribed pain medication, tested with an EMG, and referred out for emergency care when necessary. *See, e.g., Gray v. Kang Lee*, No. 9:13-CV-258 (GLS/DEP), 2015 WL 1724573, at *3

(N.D.N.Y. Apr. 15, 2015) (finding prisoner could not satisfy objective requirement where he was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist); *Nowinski v. Rao*, No. 6:14-CV-06559, 2018 WL 2303780, at \*5-6 (W.D.N.Y. May 21, 2018) (granting summary judgment to the defendants where record evidence showed the plaintiff was not deprived of adequate care where, inter alia, the inmate was provided with extensive care for his knee problems, including multiple surgeries, physical therapy, medications, and accommodations).

Moreover, no reasonable factfinder could conclude that the defendants acted with the requisite mens rea to constitute deliberate indifference. It is well settled that "differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs." *Ross v. Koenigsmann*, No. 9:14-CV-1321 (GTS/DJS), 2016 WL 11480164, at \*11 (N.D.N.Y. Sept. 8, 2016), Report and Recommendation Adopted, 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016); *see also Acosta v. Thomas,* No. 9:16-CV-0890 (LEK/TWD), 2019 WL 5197313, at \*14 (N.D.N.Y. June 21, 2019) ("[C]ourts have repeatedly declined to find that a medical provider was deliberately indifferent to an inmate's medical needs when a plaintiff challenges the type and quantity of pain medication.") (internal quotations and citations omitted) (collecting cases); *Rush v. Fischer*, No. 9 Civ. 9918, 2011 WL 6747392, at \*3

(S.D.N.Y. Dec. 23, 2011) (no deliberate indifference where defendant discontinued plaintiff's course of treatment with Percocet and provided him with another medication regimen consisting of Baclofen and Ibuprofen, against plaintiff's wishes).

Plaintiff has made no showing that the decision to prescribe alternative, non-opioid based pain medications in lieu of Percocet constituted the culpable state of mind requisite of a claim for deliberate indifference. On the contrary, Dr. Johnson's sworn declaration sets forth various, legitimate reasons for discontinuing the Percocet, including negative side effects and suspected abuse and/or addiction. There is no evidence that Dr. Johnson refused to provide plaintiff with Percocet with the intent to exacerbate his pain.

Moreover, plaintiff's deposition testimony undermines any allegation that NP Calley acted with deliberate indifference when it came to treating his pain.[11] (Dkt. No. 93-10 at 113-16). Plaintiff even admits that NP Calley was one of the providers who accommodated his alleged pain.[12] (Dkt. No. 93-10 at 115-16). The AHR further reflects NP Calley's attentiveness in treating plaintiff's medical conditions. (Dkt. No. 94-1 at 265, 272-73, 276-77, 288, 302-03, 352, 368, 371, 409).

---

[11] " She seemed . . . caring. She seemed like she, you know, she was trying to address whatever problems you may have had. But the powers that be . . . seemed like [they] wouldn't let her do her job." (Dkt. No. 93-10 at 114).

[12] "Calley would . . . being that she knew that my feet and my hands and everything was bad, she would give me a permit to be able to take a shower in the company and to eat on the company." (Dkt. No. 93-10 at 115).

Based on the evidence presented, and drawing all inferences in plaintiff's favor, this court finds that defendants did not treat plaintiff with deliberate indifference as to his pain management, and recommends granting defendants' motion for summary judgment with respect to these claims.

### 3. Podiatric Treatment

Plaintiff further alleges deliberate indifference on the part of Dr. Johnson and NP Calley with respect to the treatment of his foot "tumors." (Dkt. No. 80 at 5-6). In addition to the neuropathic pain plaintiff attributed to his lower extremities, plaintiff allegedly noticed lumps on the bottom of his feet in 2016, accompanied by an increasingly sharp pain when he walked. (Dkt. No. 93-10 at 100-01). Despite notifying Clinton medical staff of his pain, plaintiff avers that the defendants "refused" to examine his feet. (*Id.* at 102-04). In light of his pain, plaintiff wrote a letter to "regional director" Dr. Koenigsmann to ask for help. (*Id.* at 104-05). Plaintiff alleges he was then seen by podiatrist Dr. Lentini in either 2016 or 2017, at which time they performed a biopsy of plaintiff's feet. (*Id.* at 106). The lumps on plaintiff's left foot were excised sometime thereafter. (*Id.*).

Plaintiff's AHR provides further clarity. Since his arrival at Clinton, plaintiff regularly complained of tingling and/or burning pain to various extremities, including his neck, hands, wrists, back, feet and ankles.[13] With respect to his feet, on April 10,

---

[13]*See* Dkt. No. 94-1 at 415, 411, 409, 394, 384, 371, 370, 355, 356, 352, 303.

2017, plaintiff complained of "pins [and] needles" in his right foot, with an inability to flex the same foot. (Dkt. No. 94-1 at 300). The record indicates that plaintiff was in fact able to flex his foot upon examination, with no swelling or bruising noted. (*Id.*). Nevertheless, he was scheduled to follow up with a provider. (*Id.*). According to an April 19, 2017 progress note, plaintiff was temporarily housed at Downstate Correctional Facility for a court appearance when he complained about his lower extremities. Plaintiff was noted to be "belligerent, arguing [and] verbally abusive . . . threaten[ing] to slap [the writer's] glasses off," and "threatening lawsuits for neurontin." (*Id.* at 298). Plaintiff was offered a sneaker pass, which he refused, and further refused "[acetaminophen and] motrin." Plaintiff complained of a feeling of pins and needles in his feet on May 2, 2017 and May 4, 2017, and was seen by NP Calley on May 10, 2017 with the same complaint. (*Id.* at 290, 294). Plaintiff presented to the clinic with complaints of burning pain in his neck, shoulder, hands and left foot on June 8, 2017. (*Id.* at 285).

On August 22, 2017, plaintiff was seen in the medical clinic and noted to have "hard masses" in the soles of his feet. (*Id.* at 278). That day, a request for a podiatric consultation was made, and plaintiff was prescribed gel insoles. (*Id.*). Plaintiff saw a podiatrist on September 27, 2017, who diagnosed plaintiff to have "plantar fibromas vs. giant cell tumors," and recommended surgical excision of the nodules. (*Id.* at 208, Dkt. No. 93-8 at ¶¶ 43-44). The procedure on plaintiff's left foot was scheduled to take

place in December 2017; however in the interim, plaintiff was hospitalized for unrelated health issues, and the surgery was necessarily rescheduled. (Dkt. No. 93-8 at ¶ 46). The nodules on plaintiff's left foot were removed on February 9, 2018. (Dkt. Nos. 94-1 at 244; 93-8 at ¶ 47). Plaintiff was scheduled to have the same procedure on his right foot in April 2018, however he refused to undergo the procedure. (Dkt. Nos. 94-1 at 189, 244; 93-8 at ¶ 49).

Even assuming plaintiff could satisfy the objective prong of deliberate indifference, plaintiff fails to raise a material issue of fact as to whether defendants acted with a "sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280 (citing *Wilson*, 501 U.S. at 300). Contrary to plaintiff's claim that Dr. Johnson and NP Calley consciously disregarded plaintiff's podiatric condition, the record reflects that plaintiff was immediately scheduled for a podiatric consultation, and prescribed gel inserts, upon the discovery of hard masses in the soles of plaintiff's feet. Upon consultation with the podiatrist, plaintiff was diagnosed and scheduled to have the nodules removed.

Plaintiff's claim that the defendants should have referred him to a podiatrist sooner lacks merit. Plaintiff had a history of complaints regarding "burning" pain to, among other things, his lower extremities, which predated the discovery of hard masses on his soles in August 2017. The AHR reflects that defendants reasonably attributed this pain to plaintiff's alleged neuropathic disorder, which, as previously discussed, was actively treated with medical pain management, and followed with EMG testing and

diagnostic imaging. Once the hard masses on plaintiff's feet were discovered, his treatment was immediately tailored to address the issue. To the extent that defendants allegedly failed to diagnose plaintiff's podiatric condition sooner, such complaints of negligence and/or malpractice do not amount to an Eighth Amendment violation in the absence of any culpable recklessness on the part of the defendants. *See Williams v. Williams*, No. 13 Civ. 3154, 2015 WL 568842, at *7 (S.D.N.Y. Feb. 11, 2015) ("[A]llegations of a negligent misdiagnosis do not satisfy the subjective requirement of the deliberate indifference analysis because they do not suggest that the defendant acted with a conscious disregard to inmate health or safety."). Plaintiff fails to raise any facts from which recklessness can be plausibly inferred with respect to the care of his feet provided by Dr. Johnson and/or NP Calley.

### 4. Urological Treatment

In May 2016, plaintiff was evaluated for left testicular pain while admitted to Albany Medical Center Hospital for unrelated medical treatment. (Dkt. No. 94-1 at 210). Ultrasound results revealed "heterogeneous echotexture" of plaintiff's right testicle, but there was no abnormality with regard to his left testicle. (*Id.*; Dkt. No. 93-8 at ¶ 51). Plaintiff was scheduled for a follow up ultrasound of his right testicle, which he refused. (Dkt. Nos. 94-1 at 210; 93-8 at ¶ 52). There is no evidence that plaintiff experienced further pain in either testicle until October 31, 2017. On that date, plaintiff was brought to the medical clinic, by stretcher, reporting right testicular swelling and

extreme pain extending into his right groin and lower extremity. (Dkt. No. 94-1 at 267-68). Plaintiff's urine tested negative for infection, but he was nevertheless transported to an outside hospital for evaluation. At the hospital, diagnostic imaging was negative for acute testicular pathology, but did indicate that plaintiff was constipated. (Dkt. No. 93-8 at ¶ 54).

The following day, Dr. Johnson examined plaintiff and discussed the results of his tests. (Dkt. No. 94-1 at 267). Plaintiff did not complain of further testicular pain at that time. (Dkt. Nos. 93-8 at ¶ 56; 94-1 at 267). Dr. Johnson instructed plaintiff that, as a result of his unremarkable examinations and testing, and lack of pain, no treatment was warranted, and plaintiff should return to the infirmary in the event of recurring testicular pain. (Dkt. Nos. 93-8 at ¶ 57; 94-1 at 267). Plaintiff did in fact return to the medical clinic on November 3, 2017, complaining of abdominal pain, constipation, and swollen testicles. (Dkt. Nos. 93-8 at ¶¶ 58-59; 94-1 at 265). He was once again transported to an outside hospital for treatment, where diagnostic imaging revealed an abnormality on plaintiff's right testicle. (Dkt. Nos. 93-8 at ¶ 61; 94-1 at 264). Upon return from the hospital, Dr. Johnson examined plaintiff and treated him with an antibiotic and pain medicine for a diagnosis of epididymitis, per the recommendation of the hospital. (Dkt. Nos. 93-8 at ¶ 68; 94-1 at 264). Dr. Johnson also referred plaintiff for a follow-up urological consultation. (Dkt. Nos. 93-8 at ¶ 69; 94-1 at 205). According to the November 16, 2017 consult report, plaintiff reported that he was

doing "much better." (Dkt. Nos. 93-8 at ¶¶ 71-72; 94-1 at 205).  He was instructed to complete his course of antibiotics and follow up with an ultrasound in eight weeks. (*Id.*).  Plaintiff obtained a follow-up ultrasound and continued to treat with the consulting urologist and Dr. Johnson between November 2017 and February 2018. (Dkt. Nos. 93-8 at ¶¶ 74-79; 94-1 at 145-46, 198, 200).  No further abnormalities were detected.

Plaintiff has not advanced sufficient evidence to indicate that the defendants acted with a culpable state of mind to satisfy the deliberate indifference standard.  At no time did Dr. Johnson refuse to treat plaintiff's complaints of testicular pain.  On the contrary, Dr. Johnson consulted with plaintiff the day after his first hospital visit, to discuss his treatment.  Based on her own examination of the plaintiff, along with the hospital's unremarkable findings, Dr. Johnson determined that no further treatment was necessary.

Notwithstanding the fact that plaintiff was diagnosed with epididymis a few days later, Dr. Johnson was not deliberately indifferent in relying on the initial hospital diagnostic imaging and examination results in forming her judgment that no further treatment was necessary.  *See Owens v. Clark,* No. 9:16-CV-0097 (GTS/DJS), 2016 WL 6156314, at *5 n. 8 (N.D.N.Y. Oct. 21, 2016) (listing cases).  There is no indication that plaintiff had interim complaints of pain that were unaddressed.  Moreover, once plaintiff was diagnosed, Dr. Johnson examined plaintiff again and commenced the

appropriate course of treatment. There is no evidence that Dr. Johnson knew that discharging plaintiff without further treatment after his initial hospital visit would cause him harm, or acted with disregard for any such harm. *See Douglas v. Bughrara*, No. 9-11-CV-1535 (LEK/DEP), 2013 WL 5347285, at *12 (N.D.N.Y. Sept. 23, 2013) (failure to meet the subjective prong of deliberate indifference where no evidence that defendants knew installing an IV line in plaintiff's arm would cause him harm, but did it anyway, with a knowing disregard for plaintiff's health or safety).

WHEREFORE, based on the findings above, it is

ORDERED, that plaintiff's letter motion to supplement the record with medical evidence (Dkt. No. 100) be GRANTED to the extent the additional medical records have been considered in this court's review of defendants' motion for summary judgment; and

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 93) be GRANTED, and plaintiff's third amended complaint be DISMISSED IN ITS ENTIRETY.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §
636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: November 15, 2019

Andrew T. Baxter
U.S. Magistrate Judge